## PEOPLE v. FLECHTER.

(Supreme Court, Appellate Division, First Department. November 10, 1899.)

1. RECEIVING STOLEN GOODS—INTENT.

    One offering to sell property knowing it to have been stolen has the guilty intent of depriving the true owner thereof, and the criminality of the possession thereby becomes indisputable.

2. SAME—IDENTITY OF STOLEN PROPERTY.

    Where the evidence as to the identity of the stolen property with that in possession of accused was conflicting, a verdict of guilty will not be set aside, as the question was exclusively for the jury.

3. SAME—EVIDENCE—KNOWLEDGE OF THEFT.

Defendant had been employed to sell a valuable violin. It was thereafter stolen from the premises of the owner. Defendant prepared an advertisement, which he showed the wife of the owner, offering a reward for a return of the violin, and giving his address. *Held*, on trial for receiving stolen goods the advertisement was admissible to show defendant's knowledge of the theft.

4. CRIMINAL LAW—EVIDENCE—LETTER—IDENTITY OF HANDWRITING.

After the preparation of such advertisement, the wife of the owner of the violin received a letter, offering to return the violin for a reward. Experts testified that the writing of the letter was similar to the handwriting of the advertisement. Witnesses for defendant swore that the writing of the advertisement was not in the handwriting of defendant, and one witness swore that he wrote it. *Held*, that the letter was admissible in evidence, as the question whether defendant wrote the advertisement was one for the jury.

5. SAME—EXPERT EVIDENCE.

The basis laid for the admission of the letter by the expert was sufficient foundation for its admission in evidence.

6. SAME.

The letter was material.

7. SAME—EXPERT WITNESS—COMPETENCY.

Where a witness testified that he had acted as an expert witness on handwriting in courts in the United States and Canada, he was competent to testify as to whether two different papers were written by the same person.

8. SAME—IDENTITY OF HANDWRITING.

The advertisement was a sufficiently authenticated standard for comparison of handwriting with the letter, although such standard was not such as is mentioned in Laws 1888, c. 555.

9. SAME—INSTRUCTION.

The jury was properly instructed that, if said advertisement was written by the witness who swore that he wrote the same, then there was no testimony that defendant wrote the letter; but, if the jury should find that defendant wrote the advertisement, then there was expert testimony from which they might infer that defendant wrote said letter.

10. SAME.

The jury were properly instructed that, if defendant wrote the advertisement, and then wrote said letter, they might infer that when writing said letter defendant had the violin in his possession at the time of writing; and that they might take it as evidence that he kept the instrument in his possession to conceal the same, and to defraud the owner out of its possession.

11. SAME—EVIDENCE.

There was sufficient evidence to sustain a verdict of conviction for receiving said violin knowing it to have been stolen, based on the belief that the letter was written by defendant, as it contained evidence that the writer had the violin in his possession, or under his control, when said letter was written.

12. CRIMINAL LAW—EVIDENCE—HANDWRITING.

Where an instrument in writing is material in a prosecution for receiving stolen goods, and has been admitted in evidence upon testimony that defendant wrote it, an expert's comparison of said instrument with a second material instrument, which is to be offered in evidence on proof that the writing in it is in the same hand as the former instrument, is proper proof tending to show that defendant wrote the second instrument.

13 SAME—TRIAL—INCONSISTENT RULINGS—CROSS-EXAMINATION.

In a prosecution for receiving a violin knowing it to have been stolen, where an objection is sustained to a question put to a witness for the prosecution on cross-examination, asking if he had ever removed a label found in a violin at the time of its purchase, and replaced it with another,

and it is not suggested that the question goes to the witness' credibility, and the court, over defendant's objection, allows a witness for the defense on cross-examination to answer if he had put one kind of labels on violins of another kind, said answer being allowed on the ground that it goes to the credibility of the witness, the defendant cannot complain that the trial court adopted one rule as to examination of witnesses for the prosecution and a contrary rule for the defense, since, if defendant wished to press his question to affect credibility, he should call the court's attention to that fact.

**14. SAME—HARMLESS ERROR.**
A conviction will not be set aside in a criminal case where a trial court makes inconsistent or conflicting rulings on immaterial and unimportant matters.

**15. SAME—EVIDENCE—CROSS-EXAMINATION.**
Since Code Cr. Proc. § 542, provides that on appeal the court must give judgment without regard to technical errors or to defects not affecting substantial rights, a case will not be reversed where there are technical errors in sustaining objections to questions asked the people's witnesses on cross-examination, when such rulings do not keep out evidence affecting substantial rights of the accused, or cut him off from any material line of inquiry, and when his cross-examination is exhaustive.

**16. SAME—HANDWRITING—EXPERT WITNESSES.**
Bank tellers, bank officers, and other persons whose daily business and duties for several years have compelled them to scrutinize and examine writings are sufficiently qualified as experts in comparison of handwriting.

**17. SAME—APPEAL—EXPERT WITNESSES.**
The decision of a trial judge in determining whether a witness has the essential qualifications of an expert will not be held erroneous unless it is against the evidence, or mainly without the support of the facts in the case.

**18. WITNESS—IMPEACHMENT.**
Where defendant was indicted for receiving a stolen violin, and a witness, apparently unfriendly to him, testifies that the violin found in possession of defendant was not the violin which was stolen, but was one belonging to the witness, and which had unlawfully come into the possession of the defendant, a letter written by such witness to his attorney, showing that the witness was engaged with the defendant in counterfeiting trade-marks on violins, and had covered defendant's "shortcomings in faking the violin to a Strad.," was admissible to impeach the credibility of the witness to show that he knew, or covered up, and was to profit by, the acts of defendant in changing the mark of the witness' own violin so as to make it a Stradivarius.

**19. SAME.**
The fact that said last clause tended to show that defendant was using on the trial an instrument altered to resemble the one the prosecution claimed was in the magistrate's court did not make it inadmissible for the purpose of affecting credibility of E.

**20. CRIMINAL LAW—EVIDENCE—CUSTOM.**
When, in the trial of one for receiving a violin knowing it to have been stolen, evidence legally gets before the jury that defendant is a counterfeiter of violins, evidence offered by him to show that there were other counterfeiters, and that it was customary for dealers in violins to counterfeit them, should be excluded.

**21. CREDIBILITY OF WITNESS.**
Where one is subpœnaed as a witness before a magistrate to testify in a prosecution for receiving property, and he obeys the subpœna, but is not called upon to testify, but does testify in a subsequent trial under an indictment for the same crime, the fact that he was silent before the magistrate does not affect his credibility.

Van Brunt, P. J., and Barrett, J., dissenting.

Appeal from court of general sessions, New York county.

Victor S. Flechter was convicted of receiving stolen goods, and he appeals. Affirmed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, PATTERSON, and O'BRIEN, JJ.

Henry D. Sedgwick, Jr., for appellant.
Chas. E. Le Barbier, for the People.

PATTERSON, J. The defendant was tried in the court of general sessions of the peace on an indictment containing two counts: First, for the larceny of a violin; second, for criminally receiving such violin, knowing it to have been stolen. Near the close of a protracted trial, the record of which, consisting of some 650 printed pages, is now before us, the prosecution was required to elect upon which of the two counts it would rely, and thereupon it determined to abandon the first, and go to the jury upon the second. A verdict of guilty was rendered, and from the judgment entered thereon the defendant appeals. The substantial inquiries relate to the sufficiency of competent evidence to support the particular count of the indictment on which the conviction was had, the fairness of the trial, the correctness of certain rulings of the recorder who presided at the trial, and of instructions to the jury.

Cardinal matters in evidence were practically without contradiction. They may be summarized in a short narrative. Prof. Bott, a musician, was the owner of a Stradivarius violin of great value. He had employed the defendant as his agent to sell it. Negotiations had been entered into between the defendant and Signor Nicolini for the purchase by the latter of the instrument for the sum of $4,500, but the transaction fell through in consequence of Mr. Bott's refusal to accept payment in a certain way. The defendant had seen and knew the instrument and its value. About a week after the negotiations with Nicolini failed, the violin was stolen from the apartment of its owner. The defendant was informed of the theft, and undertook to aid Mr. Bott and his wife in efforts to recover it. Thus the defendant knew the article, and that it was stolen. Some months subsequent to the larceny, and also to the death of Prof. Bott, and also after the defendant had been informed that Mrs. Bott contemplated leaving the United States, the defendant offered for sale a violin which he represented at one time to be and at another not to be a genuine Stradivarius, but his final assertion was that it was genuine, and he offered it for sale as such. He was induced by a stratagem, arranged by persons who suspected him, to take the instrument for inspection to a house in Gramercy Park, where Mrs. Bott was in waiting, and there, after a careful examination, she declared it to be her husband's violin. The defendant, on leaving the house, was arrested, with the violin in his possession. It was retained by the police authorities until it was produced before a committing magistrate on the investigation of a charge against the defendant. After a hearing, the magistrate decided that the violin was not the one stolen from Mr. Bott, and directed that it be restored to the defendant, which was done. Immediately thereafter the present

indictment was found by the grand jury, and on the trial the defendant exhibited a violin, hereafter referred to as "Exhibit F 1" which he claimed, and offered proof tending to show, was the instrument produced before the magistrate; and he further gave in evidence its alleged history, to show that it was not Prof. Bott's violin. The prosecution admitted that it was not, but at the same time insisted that it was not the one taken from the defendant at the time of his arrest, and that it was not the one produced in the police court, and that the professor's violin was the one in the magistrate court, and the one found on the person of the defendant when he was taken into custody upon leaving the house in Gramercy Park. The issue before the jury, therefore, on the second count of the indictment, was as to the identity of a violin. If the defendant had in his possession what he knew to be the Bott instrument, and, knowing it to have been stolen, offered it for sale, he had the guilty intent of depriving the true owner of his property, and the criminality of the possession becomes indisputable. A clear, independent line of testimony, positive in character, and conclusive if entitled to credit, showed (some of it was not before the magistrate) that the violin in the police court was Prof. Bott's; and there were no less than ten witnesses who testified that the instrument Exhibit F 1 was not the one taken from the defendant when he was arrested, and was not the one before the police magistrate. On the other hand, five persons called by the defense swore that Exhibit F 1 was the identical instrument produced before the magistrate. In considering this conflicting testimony, the jurors were aided by evidence as to the means of knowledge and the acquaintance with the instrument or instruments of each of the witnesses, and there was also a detailed and minute description given them of the Bott violin, the measurements of which do not seem to be in full accord with those of Exhibit F 1. The history of that exhibit (in which there is one important gap), as given by the defendant's witnesses, is, in effect, that it was originally an ordinary, if not cheap, French article; and one of them swears that it was counterfeited by the defendant's direction, by erasing the name of the French maker, and by putting on it a forged label or mark of manufacture, and a spurious date, and it was in that condition offerred to a supposed intending purchaser for $5,000. On this one line of oral testimony the jury were authorized to find the verdict they rendered, if they believed the witnesses for the prosecution. Its effect upon one reading the record is to create not only a moral conviction that the defendant had in his possession the Bott violin, but also to satisfy the reader that the charge in the second count of the indictment was proven to a legal certainty, so far as that may result from weighing conflicting testimony.

But the foregoing considerations do not by any means dispose of the case. While pursuing the inquiry only on one line, an appellate court may declare the verdict of the jury to be supported; yet there was another line of proof, claimed to have been improperly allowed, which may have been that on which the verdict was arrived at. It was made so conspicuous, and almost controlling, in the rulings of the court, and was so prominent a feature of the trial, that we can-

not assume that the jury were not induced by it to find the defendant guilty. The issue as to the identity of the violin, so far as it has been above considered, depended on the credibility of witnesses, and that was exclusively for the jury. Had there been no other evidence than that relating to the theft, the defendant's knowledge of it, and the oral statements of the witnesses as to identity, we could feel assured that the result was attained by the jury relying upon the knowledge and veracity of the witnesses for the prosecution on the latter point, although they may have given heed also to circumstances telling against the defendant, but to which it is not necessary now to advert. But the other line of evidence may have been, as before remarked, influential, and even decisive, with the jury. The defendant now contends, and the argument has been earnestly, ably, and ingeniously presented, that, but for it, the jury might have declined to convict, and at least have found a reasonable doubt to exist; but that with it such an atmosphere was created, and such facts presented, that a conviction became inevitable. That it was fatal in character is clear. It is necessary, therefore, to inquire whether it was properly allowed, and, if so, whether it was properly dealt with by the court. The Bott violin was stolen on the 31st of March, 1894. The next day Mrs. Bott informed the defendant of the theft. She consulted him as to steps to be taken for the recovery of the instrument. He advised her to advertise for it, and in July, 1894, he handed her a paper, known in the case as "Exhibit No. 11," upon which was inscribed in lead pencil, partly in capital letters and partly in script, the following, viz.:

"Violin lost. $500 reward. No questions asked for return of instrument taken from residence of Jean Bott. March 31st 1894. 355 West 31st St. Absolute Safety and Security guaranteed. Victor S. Flechter. No. 23 Union Square, Violin maker and dealer."

It is important to understand just what Mrs. Bott deposed to concerning this paper, and how it came into the case. She testified that the defendant handed it to her, and said:

"'I wrote something down here. If you have that printed, and put a reward to it, then the violin—you will get your violin back.' I saw him do something in regard to that paper. He erased something, and then put this in its place: 'March 31.' Ques. Let me see if I understand that. At the time Mr. Flechter handed you this paper here, he said, 'I give you something which I have written down here?' Ans. Yes, sir. He also said, 'You must have it printed.'"

An inspection of the paper shows that the word "May" was erased and "March 31" (the actual date of the theft) inserted over the erasure. The paper was admitted in evidence and properly so. It was appropriate to showing the defendant's knowledge of the theft, and was proven to be a document he delivered, and which he declared was prepared and written by him.

Nothing of consequence is disclosed respecting the violin until the end of March, 1895, when one Durdan introduced to the defendant a Mr. Baird under the name of Southan, and represented that Southan wanted to buy for a Mr. Wright, of St. Paul, a genuine Stradivarius violin. On May 23, 1895, the defendant wrote a letter as follows:

"Mr. Southan, c. o. H. P. Durdan, 353 Broadway, N. Y. City—Dear Sir: Write to inform you that I have a genuine Stradivarius to offer you, and would like to see you at your earliest convenience.

"Very respectfully yours,    Victor S. Flechter."

Meantime, and on May 21, 1895, Mrs. Bott had written to the defendant a letter, stating, among other things, that her husband had died; that she had removed to Hoboken, and thought of going to Germany, and asked him to continue efforts to recover the violin; and informed him that before she left this country she would notify him of what her address would be in Germany. The letter bore the following as a postscriptum: "My address here (Hoboken) 306 Rivers St." On May 28th—seven days after the date of Mrs. Bott's letter to the defendant, and five days after his letter to Southan—Mrs. Bott received through the mail, at Hoboken, a letter, the text of it being partly in capital letters and partly in running script, the general appearance, style, and arrangement of lines being identical with the unique penmanship of Exhibit 11, handed by the defendant to Mrs. Bott in July of the previous year. It reads as follows:

"To Mrs. Bott, 306 Rivers St., Hoboken, N. J. Dear Madam: I wish to inform you that the violin taken from your house some time ago will be returned if you are willing to abide by agreements that will be made between you and I later on. It was my intention first to dispose of it, but on account of its great value, and the danger it would place me in by offering it for sale for such a large sum of money, I concluded to wait. I have now thought the matter over, and have come to the conclusion that a little money is better than none. If you are anxious for the return of the violin, and willing to pay a sum of money small compared with the value of the violin, I think we can make a deal. You can put a personal in the New York Sun, saying: 'I am willing to give a sum of money for the return of the violin. Mrs. J. Bott.' When I see your personal in the Sun, I will let you know how the exchange can be made.    Cave Dweller."

The theory of the prosecution was that Exhibit 15 was penned by the same person who wrote the advertisement of July, 1894 (Exhibit 11), and that, inasmuch as the defendant's declaration that he wrote Exhibit 11 was in evidence, if it could be proven that the two documents were in the same handwriting, the defendant's possession of the Bott violin would be established. There were circumstances connected with Exhibit 15 strongly indicating that it emanated from the same source as Exhibit 11. Mrs. Bott had removed to Hoboken after the death of her husband, which occurred at the end of April, 1895. In her letter to the defendant informing him of her husband's death and her change of residence, she gave her address in Hoboken. The "Cave Dweller" letter is directed to that address. It came from a person who knew of the theft, was in the exact style of the peculiar penmanship of Exhibit 11, related to the same subject as Exhibit 11, viz. a newspaper advertisement to be made by Mrs. Bott, the form of that advertisement being written in the same characters and prepared in the same way as the newspaper advertisement formulated for her by the defendant in July, 1894. If this were only a casual coincidence, it is a very remarkable one. The prosecution undertook to prove the identity of the handwriting, in the first instance, by an expert witness, Mr. Ames. He stated his qualifications; that he had been in the business of an expert in handwriting for 25 years, and

said, "I have testified on the subject of disputed handwriting in probably every court in the United States—well, every grade of court—and in Canada." The record must now be scanned to see the manner in which this line of evidence came before the court. The witness was shown Exhibits 11 and 15, and was asked if he had compared the two papers. It was objected to only on the ground of immateriality. The objection was overruled. The witness answered that he had compared the two papers, and that, in his opinion, they were in the same handwriting. Thereupon Exhibit 15 was offered in evidence. Then the defendant's counsel said: "We object to the introduction of it, on the ground that the basis laid for it by the expert is not the proper foundation for admitting it in evidence or offering it in evidence." That it was material needs no argument. Precisely what was meant by "the basis laid by the expert" is not quite clear. It does not seem to be disputed that a qualified person may testify to handwriting. This witness was qualified. It was not sought to cross-examine him as to his qualifications before the letter was offered and admitted in evidence. If the objection meant that a comparison of the handwriting of the two papers was not the proper way of proving the letter, it is plainly untenable. An expert could speak only from a comparison. The substance of the objection may have been—and it is so argued—that Exhibit 11 was not a sufficiently authenticated standard for comparison. Now, it is not disputed that it was given to Mrs. Bott by the defendant, that he prepared or had it prepared for her, and for the specific purpose of having it published in newspapers. The declaration of the defendant that he wrote it was in evidence. It is not such a standard of comparison as is mentioned in the Laws of 1888 (chapter 555), and as is required when an effort is made to prove handwriting under the authority of that statute. It was a document in evidence; a paper already in the cause, proven by the defendant's declaration to have been written by him. Williams v. Conger, 125 U. S. 413, 8 Sup. Ct. 933. We are referring now to the situation of the case when Exhibit 15 was admitted in evidence, and to nothing else. At that point there was no suggestion made as to the legal sufficiency of a standard. The evidence, so far as it had then gone, was clear. All the discussion concerning this "Cave Dweller" letter really arises upon testimony relating to it and to Exhibit 11, after they both came into the case. There is a great mass of such testimony. Several witnesses for the people swore to their belief that the defendant wrote Exhibit 11 from their general knowledge of his writing. The paper being in evidence, the testimony of the various witnesses, experts and others, respecting the handwriting, was to be considered by the jury as to its probative force and value as testimony. But the defendant called two witnesses,—one named Abraham, who swore that he wrote or prepared Exhibit 11, with the exception of the words "355 West 31st St."; and the other Jopling, who swore that he saw Abraham write it. If these two witnesses were to be believed, the whole of the prosecution's case was demolished on this branch of it. But it was for the jury to say whether they would believe them. There was enough disclosed on the cross-examination of Abraham to throw great doubt upon his

veracity, and, as for Jopling, an affidavit previously made by him was put in evidence by the prosecution, in which he states that the words "355 West 31st St.," in Exhibit 11, were written by him, and that he did not know who wrote or prepared the other parts of that exhibit.

It was not error to admit the "Cave Dweller" letter in evidence under the circumstances and at the stage of the trial at which it came into the case, but there was so much contradiction in the subsequent testimony concerning the origin of Exhibit 11 that it became of the utmost importance that the jury should be correctly and clearly instructed concerning both it and Exhibit 15. That was done. The recorder charged them with respect thereto, as follows:

"If, as the defendant claims by his witnesses, that the witness Abraham wrote the letter or paper called 'Exhibit 11,' if that be true, if you believe his testimony, then it follows that there is no testimony before you to show that he wrote the Cave Dweller letter, because it is only upon the identification of the writer of the first paper that rests the identification of the Cave Dweller paper. If you should find that the defendant did not write the first paper,—if you should find that as a fact,—then I repeat there is no testimony to warrant you in finding that he wrote the Cave Dweller; but if you do find as a fact that he wrote the first paper, taking into consideration all the testimony you have heard regarding other writings to which I have not referred, the testimony of Mrs. Bott that he gave it into her hands, and made some alterations upon it in her presence (if you believe that he wrote the first paper, the notice paper), then there is testimony called 'expert testimony' before you from which you may infer—from which you may believe—that he wrote the second paper, called the 'Cave Dweller' communication; and if you find these two facts, that he wrote the first paper, called the 'notice,' and then he wrote the second paper, called the 'Cave Dweller,'—the anonymous communication,—then you may infer that in writing the anonymous communication that this defendant had the violin in his possession at that time, and that he wrote that communication for some purpose, either to dispose of the violin by some surreptitious means, or to conceal it; and you may take it as evidence that he kept the violin in his possession for the purpose of concealing it, and defrauding the owner of its possession."

Enough has been said on this second line of evidence to show that, as the case was tried, the question of the handwriting of the "Cave Dweller" letter was properly submitted to the jury, and that there was competent and sufficient evidence to sustain their finding based on the belief that that letter was written by the defendant, for it contained evidence that the writer had the stolen violin in his possession, or under his control, on May 28, 1895. Here the two lines of proof converge, for Durdan swears that on June 23d he went to the defendant's shop, and in the defendant's absence a clerk took from a safe a violin. The witness noticed the mark and date upon it, being the identifying mark and date of the Bott instrument. He also swore that it was the same violin the defendant took to the house in Gramercy Park, and which Mrs. Bott then recognized as her husband's violin. Thus by both lines of evidence the verdict is supported.

We have now to consider whether there were errors in the rulings of the recorder for which the judgment should be reversed. It is urged that he laid down "one rule as to the examination of witnesses for the people and the contrary rule for the defendant."

60 N.Y.S.—50

Certain claimed specific instances of this alleged unfairness are brought to our attention. Gernunder, a witness for the prosecution as to the identity of the violin, was asked if he ever removed a label he found in a violin at the time of its purchase, and replaced it with another. A general objection to the question was taken. It was not suggested that the question went to the credibility of the witness. Whether he did or did not remove labels could not affect his knowledge of this particular violin. At a later stage of the trial one Schilbach, a witness for the defense, testified that the violin Exhibit F 1 was the violin before the magistrate. He swore that at the time the defendant bought that instrument it had an iron stamp branded on it, and he (the witness) scraped it out. He was then asked if he put a Stradivarius label on it, to which he answered, "May be I did, and may be not." He was then pressed further, and asked "You have placed Strad. labels on Nicholas instruments?" to which he replied, "I am not sure about this. Ques. Have you put Strad. labels on instruments that were not Stradivarius?" That was objected to, and the court allowed an answer to be given on the ground that it affected the credibility of the witness. The two instances are not alike. If the defendant had wished to press the question to Gernunder on the ground that it went to credibility, he should have called the attention of the court to it. Again, it is urged that there were conflicting rulings respecting what Mrs. Bott testified to and other persons said in the magistrate's court, but they relate to immaterial and unimportant matters, and the same may be said of the testimony of the witness Bruckner concerning the value of the violin used on this trial.

It is also argued that the right of cross-examination of the witnesses for the prosecution was improperly abridged. Instances are cited in which questions asked of Mr. Ames, Dr. Fisher, Curtis, Kelly, Kitchell, and other expert witnesses were not allowed. It may have been technical error to exclude some few of them, but it is too much to say that in consequence thereof the right of cross-examination was unduly restricted, in view of the thorough, exhaustive, adroit, and long-continued examination of each of the witnesses by the defendant's counsel. The material inquiry is whether, by the rulings on any of those questions, a substantial right of the defendant was impaired, and evidence kept out which it was due to him should have gone before the jury. The duty of the court in considering this subject is not uncertain. Section 542 of the Code of Criminal Procedure provides that on appeal the court must give judgment without regard to technical errors or to defects which do not affect substantial rights; and in commenting on that and the cognate section 684, the court of appeals says that those are mandates to which a court, with reason and discretion, should give full force and effect. People v. Dimick, 107 N. Y. 13, 14 N. E. 178. We do not consider that any of the criticised rulings were upon matters that affected the substantial rights of the defendant, or cut him off from any material line of inquiry he was entitled to follow; and that conclusion is reached, not by consid-

ering isolated questions selected from the record, and made the subject of animadversion, but from a very careful reading of the whole testimony of each witness upon whose examination a criticised ruling was made.

It is further insisted that the recorder erred in allowing bank clerks and certain other persons to testify as expert witnesses to the handwriting of exhibits, and to give opinions respecting it. There is no distinct legal rule defining the precise qualifications of this class of witnesses. Whether one is qualified depends upon his knowledge of a given subject of inquiry, his experience in connection with it, and his capacity to form an opinion. Respecting handwriting, bank tellers and officers, and others whose daily business and duties compel them to scrutinize and examine writings, are always allowed to testify as experts, and they may aid the jury in the comparison in a proper case. Dresler v. Hard, 127 N. Y. 239, 27 N. E. 823. It must, of necessity, rest, in the main, with the trial judge to determine whether a particular witness has the essential qualifications, and his decision will not be held to present an error of law requiring a reversal unless it is against the evidence, or mainly without support in the facts appearing in the case. Slocovich v. Insurance Co., 108 N. Y. 56, 14 N. E. 802. The prosecution's witnesses on this subject were shown to be men of experience in matters of disputed handwriting. Twitchell was paying teller of the Sixth National Bank, and for some years had the responsibility of passing upon disputed and questioned signatures. Ennis was paying teller of the Fourteenth Street Bank, in which the defendant kept an account, and spoke not only from general experience, but from acquaintance with the defendant's signature. Curtis was the paying and certification teller of the Bank of the State of New York, and the study of disputed or questioned handwriting had been a principal part of his business for 20 years. Peck, paying teller of the Mechanics' & Traders' Bank, had an experience of 17 years, and Decker of the same length of time, in several banks, and he also knew the defendant's writing. It is said that these witnesses were accustomed only to pass checks in ordinary script, and hence were not qualified to testify as to such characters as appear in Exhibits 11 and 15; but it must be remembered that parts of those papers were in ordinary running script. We cannot hold that it was error to allow these witnesses to testify as experts.

On the cross-examination of Eller, a witness for the defense, a question arose respecting the admissibility in evidence of a letter (and more particularly of its last paragraph) written by the witness, and directly relating to the violin Exhibit F 1. Eller had testified that he was the real owner of that violin; that it had been stolen from him by one Perrotti; that he had found it in the defendant's possession; that he brought a replevin suit against the defendant, and the suit had not been settled; that the instrument had been changed,—the "f" holes and the back,—and that a Stradivarius label had been put in since it was stolen. It was really a Nicholas violin. This witness came upon the stand apparently a

litigant, unfriendly to the defendant. He also testified that he was in the magistrate's court, and saw Mrs. Bott there identify this same violin as her husband's. If he were a credible witness, his testimony was of great consequence. The prosecution undertook to break its force by showing that he was not the disinterested, fair-minded, honest person he seemed to be; that terms of settlement of his replevin suit had been agreed upon, and that he was to share with the defendant in the price obtained on a sale for a counterfeited violin, the falsification of which he had covered or concealed. The letter is as follows:

"Clifton House, Chicago, March 23, 1896.

"Dear Counselor: Received your letter just now. I have been expecting Mr. Flechter's lawyer would settle with you. He got $900 for the violin, and Mr. Meyer arranged with myself for $450, which he proposed himself, and have been expecting a settlement on their part long ago. I have assisted Mr. Palmer, his able lawyer, with the best of my ability, and have covered Mr. Flechter's shortcomings in faking the violin to a Strad.

"Yours, most sincerely,          John Eller, etc."

That letter was addressed to Eller's lawyer (there is no question of privilege in the case), and it directly affected the credibility of the witness. It showed that terms of settlement had been agreed upon, and that he knew, and had covered up, and was to profit by, the counterfeiting of his own stolen violin. The letter was competent on the subject of his credibility. It is contended that the last paragraph should not have been put before the jury; that it must have been greatly prejudicial to the defendant; that it was a mere statement, without proof, that he was a counterfeiter of violins (a fact which was subsequently proven by one of his own witnesses). That is undoubtedly so, but it was also a statement of the witness as to his own conduct and actions, stamping them with dishonesty, and directly impairing his credit. It is said, also, that it tended to show that the defendant was using on this trial an instrument altered to resemble the one the prosecution claimed was in the magistrate's court, but that did not make it inadmissible if it were legitimately received for the other purpose; and we think it was.

Another word is required upon this subject of the defendant having counterfeited violins. That he did so was shown on the cross-examination of the witness Schilbach. It was elicited in cross-examining the witness on the history, as he claimed, of the violin Exhibit F 1, and was legitimate cross-examination. It is now argued that the defendant should have been allowed, as he offered (but was not permitted), to show that there were other counterfeiters of violins, and that it was customary for dealers to counterfeit them. It is sufficient to say that the court was right in its ruling on this subject. It was sought to do away with the unfavorable inferences to be drawn from the evidence against the defendant; but his fraud and wrongdoing could not be mitigated, or palliated, or excused, or made inoffensive because he had rivals or competitors in the same fraudulent and disreputable business practices.

There is but one other matter requiring consideration, and that relates to a supplemental charge of the recorder concerning the

witness Gernunder. He was one of the most important witnesses for the prosecution, and he positively swore that the violin in the magistrate's court was Prof. Bott's. He knew it, and had seen it several times. The jury considered the testimony of this witness as of great consequence, for, after they had retired to deliberate, they sent a communication to the court asking to have his testimony read to them. Thereupon they were sent for, and the stenographer's minutes of the testimony of the witness were read to them in full. The recorder made them a supplementary address concerning the credibility of the witness. It had been attacked by the defense. Gernunder was present when the police magistrate gave his decision. He had been subpoenaed by the defendant to attend there. He was not called to the stand in that court. Gernunder remained silent. It is now claimed that this witness was not entitled to credit, because, not being called by either side, he did not interrupt the magistrate, thrust himself into the case, and demand to be sworn and allowed to testify. He had obeyed the subpoena, was in attendance waiting to be examined, but the case was submitted without calling him. On this particular point the recorder's charge was correct, and only just to the witness. No fair imputation could be made against him under such circumstances. The jury were told that in all other respects his credibility was a matter for their determination.

The judgment should be affirmed.

RUMSEY and O'BRIEN, JJ., concur.

BARRETT, J. (dissenting). I am unable to concur with the majority of my brethren in the affirmance of this judgment. The question which was put upon cross-examination to the prosecution's witness Gernunder—referred to by Justice PATTERSON—went to his credibility. This is conceded. The objection to the question was sustained. It is said that the defendant's counsel should have called the court's attention to the fact that the question went to Gernunder's credibility. That, however, was apparent. And I know of no rule which puts upon who asks of a witness a perfectly proper question, to which there is but a general objection, the burden of explaining to the court the legal basis of its propriety. That the learned judge was not unmindful of the defendant's right to cross-examine upon collateral matters tending to affect the witness' credibility is evidenced by the fact that he overruled the defendant's objection to a similar question put by the prosecution to one of his witnesses upon the express ground that it went to the witness' credibility.

It is also conceded that the defendant's right of cross-examination was abridged in the case of several of the prosecution's expert witnesses. Notwithstanding the cross-examination of these witnesses upon other points,—which was undoubtedly thorough,—it seems clear to me that the exclusion of questions which went to the value of their testimony, and to the weight which should be given to it, was error. To rule out questions, the answers to which, if allowed, might have seriously detracted from the force of these witnesses' direct testi-

mony, surely impaired the substantial rights of the defendant. How can we be reasonably certain that the jury would have convicted the defendant without the direct testimony of these experts? And who is to say that that full credit which was requisite to the conclusion of guilt would have been given to them had they been permitted to answer the questions under consideration?

Again, the supplementary charge substantially withdrew from the jury the consideration of the effect of Gernunder's silence in the police court. It was well enough to point out that Gernunder was not then legally bound to speak. But the learned judge held, in effect, as matter of law, that the witness' silence at the time and under the circumstances did not bear in any degree upon his credibility. He entirely withdrew the incident from the consideration of the jury. This, I think, was erroneous. An expression of the learned judge's opinion as to the effect of the situation might not have been inappropriate. In the end, however, the jury should have been left free to determine whether the witness, seeing what he knew to be an injustice done before his eyes, remained silent merely because he doubted the propriety of asserting his knowledge, even to the counsel for the prosecution, or whether in truth he remained silent because he saw that no injustice was being done, and that the real facts, within his breast, were in accordance with the police magistrate's judgment.

I also have grave doubt of the propriety of admitting that part of Eller's letter—quoted in full by Justice PATTERSON—in which he states that he has "covered Mr. Flechter's shortcomings in faking the violin to a Strad."

There should be a new trial.

VAN BRUNT, P. J., concurs.